No. 714.

First Circuit

———

HAAS v. GLOBE INDEMNITY CO.

———

•

(January 26, 1931. Opinion and Decree.)
(March 3, 1931. Rehearing Refused.)
(April 27, 1931. Writs of Certiorari and Review Refused by Supreme Court.)

———

John W. Lewis and Leon S. Haas, Jr., of Opelousas, attorneys for plaintiff, appellee.

L. L. Perrault, of Opelousas, attorney for defendant, appellant.

LeBLANC, J. The defendant appeals from a judgment of the district court which awarded the plaintiff compensation under the Employers' Liability Law (Act No. 20 of 1914, as amended) in the sum of $20 per week for a period of one hundred weeks, for the loss of his left eye.

Plaintiff, John A. Haas, who was employed by his father, Leon R. Haas, elected to bring suit directly against his employer's indemnitor, the Globe Indemnity Company.

He alleged in his petition that he was employed as manager of a gasoline oil filling station in the city of Opelousas, and that on June 4, 1929, while repairing an automobile tire for a stranger, which work was within the scope of his employment, he was struck in the left eye by a tire tool which slipped while he was attempting to remove the tire from the rim of the wheel to which it was attached. As a result of the accident, he avers that it became necessary to remove the injured eye, the operation therefor having been performed by Dr. W. R. Buffington, at the Baptist Hospital in New Orleans, on or about June 13, 1929.

In his original petition, plaintiff alleged that his weekly wage was $15, and he accordingly demanded compensation at the rate of 65 per cent of $15, or the sum of $9.65 per week for a period of one hundred weeks, that being the compensation provided for under our statute (Act No. 20 of 1914, sec. 8, subsec. 1, par. c, as amended by Act No. 242 of 1928, sec. 1) "for the loss of an eye."

In answer to the demand, defendant denied that the plaintiff had been injured as alleged by him, and, as an alternative defense, urged that if he had been injured as claimed that the removal of the eye was in no way connected with the injury he is said to have received on June 4, 1929, but was due to another injury to the same eye which plaintiff had sustained four or five years before, when he was shot by an air-rifle ball.

As a further alternative defense, it is urged that if it be held that the injury of June 4, 1929, was the proximate cause of the removal of the eye, that plaintiff's vision had been so impaired prior thereto by reason of the former accident, he is only entitled to compensation in an amount proportionate to the degree of sight or usefulness of the eye that remained. That degree, it is claimed, should not in any event exceed 25 per cent of the amount sought to be recovered.

In a supplemental petition filed subsequent to the filing of defendant's answer, plaintiff alleged that the fixing of his

**182**

weekly wage at $15 in his original petition was in error, because as a matter of fact he was receiving from his employer, in addition thereto, and as compensation for his services, board and lodging, laundering, cleaning, and pressing for himself and his wife, all of which amounted to $75 per month, and therefore he was entitled to the maximum compensation of $20 per week as provided in the statute, for the period of one hundred weeks. All of this, the defendant, in answer, denied.

It thus appears that there are three separate and distinct questions which present themselves for consideration and determination:

1. Did the plaintiff suffer an accidental injury to his left eye on June 4, 1929, as set out in his petition, and, if he did, was that injury the cause of the total loss of vision in the eye and of its consequent removal?

2. Does the removal of an eye which had been injured in a previous accident, and which injury had caused an impairment of vision, constitute "the loss of an eye" as contemplated under our Workmen's Compensation Law?

3. Are board and lodging, laundering and pressing furnished to the employee by the employer in the way of wages to be taken into consideration in determining what are the employee's weekly wages under the compensation statute?

Plaintiff gives a frank and straightforward account of how, on attempting to remove a flat tire from a stranger's automobile on June 4, 1929, at about 8 o'clock in the morning, the tire tool, with which he was trying to pry the rim from the wheel, slipped while he was in a stooping position, and struck him in his left eye. There is no denial of his statement except by inference to the effect that he did not complain to any one at the moment of receiving the severe injury he claims, and continued working on the tire until he had finished repairing it. He explains that he was alone at the time, the negro help having been called to render service to some one on the road, and the customer he was attending had asked him to hurry his job. He did, immediately upon being struck in the eye, call his personal friend and physician Dr. Oscar Bienvenu over telephone, and the latter answered his call within fifteen or twenty minutes. That he did continue to render service in the face of suffering we think is rather commendable and in no way does it detract from his account of the accident.

Dr. Bienvenu corroborates his testimony to the effect that he arrived at the filling station within a few minutes after receiving his call. He says that he found plaintiff complaining of an injury to his left eye, which, on examining, he found to be red and bruised and appeared to have been recently injured. He was plaintiff's close friend, was frequently in his company, and had not noticed that appearance in his eye before. There was no doubt in his mind that the present condition of the eye had been produced by an injury of recent origin. Louis Desamore, the negro helper around the station, returned from the road service call while Dr. Bienvenu was examining plaintiff's eye, and he also says that it was red and bloodshot, a condition he had never seen in it before.

To the extent that he also observed the discoloration in plaintiff's left eye the day of the accident, which condition did not exist before, it may be said that the testimony of his father, Mr. Leon R. Haas, is also corroborative on this point.

There is an abundance of proof, there-

fore, to support the finding of the trial court that plaintiff did receive an injury to his left eye on the morning of June 4, 1929, in the manner as stated by him.

He testifies that when he was struck, his vision in that eye became totally obscured. "I noticed everything went black," he says: "I closed my right eye and the light was all gone."

It is shown that some four years prior to the present accident, plaintiff had been accidentally shot in this same eye by an air-rifle ball. He did not, however, lose the entire vision in the eye. "There was always light," he says, "and I could distinguish light from darkness after the accident." He was under the care and treatment of Dr. Feingold of New Orleans, for about two years, and showed improvement enough to justify that eminent eye specialist to discharge him.

Dr. George R. Beridon of Opelousas, who specializes in diseases of the eye, nose, ear, and throat, testified as witness for the defendant, and while his testimony is not favorable to the plaintiff with regard to what was the proximate cause of the removal of his eye, it cannot be said to be unfavorable. Dr. Beridon knew young Haas and was acquainted, not professionally, however, with the fact of his injury from the air-rifle shot. It was Dr. Bienvenu who took the plaintiff to his office for an examination a few days after the accident at the filling station. During the examination, it is shown that Dr. Beridon was not told anything about this last accident, and, knowing only of the former, quite naturally, in our opinion, he associated it with the condition he found in the eye. He could see, however, so he says, that the eye had been subjected to some traumatism. At the moment he considered it necessary to advise an immediate removal of the eye, but this advice was based on the actual condition which presented itself, and he makes it plain that he was not interested in the cause at all. It is shown that Dr. Feingold did not at any time suggest or advise the removal of the eye after the first injury. It is reasonable to assume that he would not have removed it considering the improvement he reported to his patient and also the amount of vision that remained in the eye. On the other hand, Dr. Buffington lost no time in removing it after the second injury, and it is equally reasonable to assume that he would not have done so unless it was absolutely necessary and the sight was all gone.

From the facts as we find them and appreciate them, we think it is safe to conclude that it was the accident and injury which plaintiff received on June 4, 1929, that was the proximate cause of the removal of his eye.

The second question presented comes under defendant's first alternative defense that plaintiff's recovery, if he is entitled to any, should be restricted to the degree of vision which he had remaining in the injured eye before the accident. The amount defendant arbitrarily fixes at 25 per cent of normal, and it would have compensation limited to twenty-five weeks.

The defense of comparative vision or the prior loss of the industrial use of the eye seems to be presented here for the first time in our jurisprudence; but if we are to give consideration to the adjudications of appellate courts in other jurisdictions where, in workmen's compensation statutes, like in ours, compensation is allowed "for the loss of an eye," we are bound to hold, under the weight of authority, that the doctrine does not apply here.

Most of the decisions, as we view them, are grounded on the clear provisions of the statute which awards compensation "for the loss of an eye" and makes no reference whatever to any impairment of the sight or the loss of any degree of vision therein.

In Hobertis v. Columbia Shirt Co., 186 App. Div. 397, 173 N. Y. S. 606, 607 (1919), it was said:

"The statute does not provide that the loss of the use of an eye shall be compensated by an award based upon the amount of vision which existed previous to the accident, whether it be 50 per cent or 80 per cent of vision lost. It awards specific compensation for the loss of an eye."

In Michigan, the Supreme Court of that state has had the question before it on a number of occasions, and it has consistently held that:

"Where servant's eye was injured necessitating removal, he was entitled to full compensation for loss of an eye as provided by Workmen's Compensation Act, pt. 2, sec. 10, notwithstanding an earlier injury had impaired vision of eye to extent that he could not see anything directly in front of him, and could not see with it to do his work, although upon turning his head sideways, he could distinguish objects at some distance. Liimatta v. Calumet, etc., 229 Mich. 41, 201 N. W. 204."

In an earlier case, Purchase v. Grand Rapids, etc., 194 Mich. 103, 160 N. W. 391, 392, that same court, in awarding compensation to an employee for the loss of an eye by removal, in which sight had been greatly impaired by a previous accident, said:

"The Legislature has not attempted a definition, or made a declaration, applicable to the case at bar, except in terms of the loss of an eye. It has not specified a normal eye, although it may be concluded that the law refers to an eye which performs in some degree the functions of a normal eye. A mere sightless organ might perhaps be considered no eye at all. Claim-

ant has lost an eye, although an infirm one. It was not wholly useless as an eye. On the contrary, the testimony is that he could with it distinguish light and see approaching objects. As a result of the injury, there was disability, and the disability is 'deemed to continue for the period specified, and the compensation so paid for such injury shall be as specified. * * *'"

The facts, as they appear from that decision, are strikingly similar on this point, to those in the case before us; the difference, if any, being that the plaintiff here enjoyed more vision. The testimony reveals that in his anxiety to learn if he was recovering more of his sight, he frequently had his father and friends conduct tests with him, which showed that he had improved to the extent that he could discern objects and could also count the fingers of the hand and read bold type and headlines in the newspapers at a distance of eight inches or a foot. For that reason it can be said that he had even greater use of his injured eye than did the plaintiff in the case last quoted from.

The Supreme Court of Minnesota had the same question before it in the case of Mosgaard v. Minneapolis Railway Co., 161 Minn. 318, 201 N. W. 545, and held that a workman, although blind from childhood in an eye which was injured in a subsequent accident, requiring its removal, was entitled to compensation for the full "loss of an eye" as provided for in the Compensation Law of that State enacted in 1921.

In Chicago Bridge & Iron Co. v. Industrial Commission, 316 Ill. 622, 147 N. E. 375, we note the Supreme Court of the State of Illinois, citing some of the foregoing authorities with approval in passing on the same question which was involved in the case before it.

There are jurisdictions in which it has

been held that where the employee had already lost the use of his eye, he cannot recover for the loss of the organ by removal because of another accident, but the weight of authority, as already pointed out, seems to be otherwise, and as it appears to be more consonant with the clear and specific provision of our statute, we feel safe in following it in this case by allowing the plaintiff, as did the lower court, compensation for the full loss of his eye, for the full period of one hundred weeks.

We come now to the last question presented, that is, whether or not, under our Compensation Law, the amount furnished the employee by the employer in the way of board and lodging, laundering, etc., can be taken into consideration, in computing his average weekly wage. Here again, it seems, we have a matter that is res nova in our state.

We can think of no sound reason why such items should not be included in computing an employee's earnings, provided, of course, they have been actually furnished. There seems to be no doubt that they were in this case.

We have been referred to no case by counsel for defendant in which they were excluded in the computation, and, on the other hand, counsel for plaintiff has cited and referred us to a number of decisions from other states and also some English cases, in which their value was considered in arriving at the amount of the average weekly or daily wage. Attention is called to the cases of O'Callahan v. Dermedy, 197 Iowa, 632, 196 N. W. 10, 197 N. W. 456; Medland v. Houle, 202 Mich, 532, 168 N. W. 446; Baur v. Court, etc., 88 N. J. Law, 128, 95 A. 627; Dauthie v. MacAndrew, Butterworth's Compensation Cases, vol. 1, p. 308; Rosenquist v. Bowring & Co., 1 Butterworth's Compensation Cases, p. 395; and others. Those of the cases cited to which we have had access support the contention that board and lodging are included in the computation of a workman's wage when furnished as part of his pay.

In an English case, Helps v. Great Western Ry. (1917) W. C. & Ins. Rep. 199, which we find in an annotation in Negligence and Compensation Cases Annotated, vol. 15, p. 1015, the court permitted the applicant for compensation, who was a passenger porter in the employ of the defendant, to include the average weekly tips of 12s. which he received in the computation of his earnings. In Sloat v. Rochester Taxi-Cab Co., 177 App. Div. 57, 163 N. Y. S. 904, the court extended the same benefit of including tips to a taxicab driver, in reaching the amount of his wages on which to base his compensation. If tips and gratuities contributed to the employee by the travelling public are to be taken into consideration, a fortiori should the board and lodging furnished him as an incident to his contract of employment be included in computing the employee's average weekly wage.

It is urged that these items so furnished to the plaintiff were not carried by the employer on his books from which the defendant made its schedule of wages on which to base the premium to be paid by the employer, but we agree with the learned trial judge that the employee cannot be held responsible for the failure of his employer to so enter them. He cannot be deprived of his compensation for any irregularities which may appear in his employer's books.

We find the judgment of the lower court to be correct in every respect, and it is therefore affirmed.